# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

RAJON CHERRY and SHERRIL
JOHNSON, on behalf of Rajon
Cherry,

    Plaintiffs,

    v.

RICHARD ALLEN, ZACHERY HAMPEL,
and GLYNN COUNTY,

    Defendants.

2:23-CV-90

## ORDER

Before the Court is Defendants Richard Allen, Zachery Hampel, and Glynn County's motions for summary judgment. Dkt. Nos. 28, 32. The motions have been fully briefed and are ripe for review. Dkt. Nos. 28, 32, 38, 40, 45, 46. For the reasons stated below, Defendants' motions are **GRANTED** as to Plaintiffs' federal law claims, and Plaintiffs' state law claims are **DISMISSED without prejudice.**

## BACKGROUND

This case is a striking example of why courts cannot analyze an officer's use of force "with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). Police officers responded to an emergency call about a man "flipping out" on a public road, wielding a knife or crowbar. Dkt. No. 33-1. This man

disobeyed the officers' commands and was repeatedly tased. Dkt. Nos. 28-3, 28-4. Unbeknownst to the officers, the man had been diagnosed with autism spectrum disorder. Dkt. No. 38-2 ¶ 1. While the facts of this case are tragic and the body camera footage is upsetting to watch, such a police encounter does not always amount to a viable claim under the Constitution, as the undisputed facts show.

At approximately 8:25 P.M. on September 4, 2021, a 911 call came in to the Glynn County Police Department describing a man "in the middle of the road" near the intersection of Altama Avenue and Stafford Avenue in Brunswick, Georgia. Dkt. No. 33-1, Dispatch Report.[1] The caller indicated that the man had "a knife or crowbar" and expressed concern that he was "flipping out," "running up towards cars. . . going to get hit," and eventually hitting himself with the crowbar. Id.

Shortly thereafter, Glynn County Police Officer Richard Allen arrived on the scene. His body-worn camera shows that the man, later identified as Plaintiff Rajon Cherry, is quite large and was in the street holding a sizeable metal object. Dkt. No. 28-3, Officer Allen Body-Worn Camera Footage at 00:53. Cherry was not

---

[1] Plaintiffs rely on the audio of the 911 call to provide more information from the 911 caller. See Dkt. Nos. 38, 38-4, 38-20. It is undisputed, however, that the officers did not hear the full 911 audio; only the information in Dispatch Report was communicated to the officers. Dkt. No. 47.

wearing a shirt nor shoes. Id. at 00:59. Officer Allen believed that the metal object he could see was a wrench. Dkt. No. 28-1 at 35:23-25. The body-worn camera footage shows that Cherry began to walk towards Officer Allen. Dkt. No. 28-3 at 00:53-01:06. In response, Officer Allen immediately pulled his taser out and ordered Cherry to drop the metal object. Id. He repeated the command four times, for a total of five commands to drop the object. Id. When Cherry did not drop the object and got closer, Officer Allen deployed his taser. Id. at 01:07. The taser shock caused Cherry to drop the object, yet Cherry remained standing. Id. Officer Allen then ordered Cherry to get on the ground. Id. at 01:13-01:25. He repeated the command after Cherry refused the command. Id. After Cherry did not comply, Officer Allen deployed the taser a second time, causing Cherry to fall to the ground. Id. at 01:13-01:25. Simultaneously, Glynn County Police Officer Zachery Hampel arrived at the scene. Id. at 01:24. The two officers attempted to subdue Cherry, but then Cherry began running away. Id. at 01:25-01:48.

As Cherry ran away, both officers deployed their tasers while ordering Cherry to the ground. Id. at 01:48-01:58. Cherry stopped running but did not get on the ground. Id. For nearly thirty seconds, Cherry stood and looked at the officers while they continued to order him to the ground. Id. at 02:03-02:30. Cherry then began to calmly walk away; the officers followed him down

Stafford Avenue as traffic went around them. Id. at 02:31–03:49. While they are walking, Officer Allen deployed his taser, and it had no visible effect on Cherry. Id. at 02:46. When Officer Hampel gently attempted to put Cherry's arms behind his back to handcuff him, Cherry took off running. Id. at 03:51–03:55. The officers chased Cherry for a few seconds before Officer Allen tased him again. Id. at 03:59. Then, Officer Allen unsuccessfully attempted to tase Cherry two more times before Officer Hampel tackled Cherry. Id. at 04:38–05:05. Officer Hampel and three other officers who had arrived at the scene handcuffed Cherry on the ground and helped him to a seated position after nearly three minutes of effort. Id. at 05:05–08:08.

During the struggle to handcuff Cherry on the ground, Cherry's sister approached and yelled at the officers that her brother is autistic. Id. at 05:35–05:48. Prior to this, a bystander, believed to be the 911 caller, shouted to the officers several times that Cherry was "mental health," perhaps implying that his noncompliance was due to a mental health crisis. Id. at 00:56, 02:01, 02:53. Several other bystanders gathered and shouted at the officers throughout the incident. Id. at 03:30–05:30.

By the end of the incident, Cherry had eight taser prongs pierced into his chest and back, causing bleeding. Officers used a specialized tool to remove taser prongs and called for emergency medical services to evaluate Cherry. Dkt. No. 33-3, Officer Jackson

Incident Report at 12. EMS concluded that Cherry would likely be more comfortable in the patrol car where he was already seated rather than in the back of an ambulance, and an officer thus drove him to the hospital in the patrol car. Id. Approximately twenty minutes after officers arrived at the hospital with Cherry, Cherry's mother—Plaintiff Sherril Johnson—arrived and checked him out of the facility. Dkt. No. 28-5, Johnson Dep. at 39:9–17. Johnson treated Chery at home for the taser prong wounds, and he suffered no additional physical injuries. Id. at 39:21–25. Cherry has not been diagnosed with any psychological injury, but he is now afraid every time he hears an emergency siren or the words "police" or "cop." Dkt. No. 38-2, Johnson Declr., ¶ 9.

All involved now know Cherry is a twenty-three-year-old man with autism spectrum disorder. Dkt. No. 28-5 at 5:17–18, 13:9–15. Unbeknownst to the officers during the incident, he has a vocabulary of approximately twenty words. Dkt. No. 38-2 ¶ 2. The object believed to be a wrench, crowbar or knife carried by Cherry was actually a long metal cooking spoon. Id. ¶ 6, Dkt. Nos. 28-1 at 35:23-25, 33-1. It is not clear from the record how Cherry came to be walking in traffic at night with the metal spoon on the evening of September 4, 2021. According to Plaintiff Johnson, Cherry and his sister "were getting ready to go out to eat dinner." Dkt. No. 28-5 at 28:10. After getting Cherry dressed, his sister went to the bathroom. Id. at 28:10-17. She "turned around to go

back outside" and did not see Cherry. Id. at 28:18–19. A neighbor came up to her, told her Cherry was "down the street," and the "officers have him." Id. at 28:19–20.

Plaintiffs Cherry and Johnson brought this case alleging violations of Cherry's constitutional rights, namely: an excessive force claim against Defendants Allen and Hampel; a failure to intervene claim against Defendant Hampel; and a municipal liability claim against Defendant Glynn County, Georgia, each arising under the Fourth Amendment.[2] Dkt. No. 1. Plaintiffs also bring a state law claim for assault and battery against all Defendants. Id. Additionally, Plaintiffs bring three claims under the Americans with Disabilities Act and Rehabilitation Act against Defendant Glynn County. Id. Finally, Plaintiffs seek punitive damages and attorney's fees pursuant to federal and state law against all Defendants. Id.

## LEGAL STANDARD

The Court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and

---

[2] There is a dispute over whether Plaintiff properly plead the failure to intervene claim. See Dkt. Nos. 38 at 17, 40 at 16, 45 at 9–10.

identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in its pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576–77 (11th Cir. 1990).

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255.

**DISCUSSION**

I.  **Plaintiffs' Constitutional Claims**

 **A. 42 U.S.C. § 1983**

 Section 1983 of Title 42 of the United States Code ("§ 1983") provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. This creates a right of action for vindicating federal rights guaranteed by the Constitution and federal statutes. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). Section 1983 is not a source of substantive rights. Id.

 To prevail on a § 1983 claim, a plaintiff must establish that "the conduct complained of (1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing Flagg Bros. v. Brooks, 436 U.S. 149, 156–57 (1978)).

 **B. Qualified Immunity**

 Even when a plaintiff can prove the elements of a § 1983 claim, qualified immunity may nevertheless block the recovery of damages. Qualified immunity is an affirmative defense. Ledea v.

8

Metro-Dade Cnty. Police Dep't, 681 F. App'x 728, 729 (11th Cir. 2017) (citing Skritch v. Thornton, 280 F.3d 1295, 1306 (11th Cir. 2002)). When successfully invoked, qualified immunity shields government officials who perform discretionary functions from civil liability. Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity allows "government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation." Durruthy v. Pastor, 351 F.3d 1080, 1087 (11th Cir. 2003) (citation omitted). It shields "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation omitted).

"An official asserting the affirmative defense of qualified immunity must initially establish that he was acting within the scope of his discretionary authority, and the burden then shifts to the plaintiff to show that the official is not entitled to qualified immunity." Ledea, 681 F. App'x at 729 (citing Skop v. City of Atlanta, 485 F.3d 1130, 1136-37 (11th Cir. 2007)). An official acts within the scope of his discretionary authority if he performs a legitimate job-related function through means that were within his power to utilize. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1266 (11th Cir. 2004) (citing Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir.

1994) ("A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority.")). Plaintiffs do not dispute that Defendants acted within their discretionary authority here. Dkt. Nos. 38, 40.

If the defendant establishes that his relevant conduct fell within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity does not apply under the two-prong test established by the U.S. Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001). Under the first prong, the Court determines whether the facts viewed in the light most favorable to the plaintiff "show the officer's conduct violated a constitutional right." Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002) ("The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (citing Scott v. Harris, 550 U.S. 372, 377 (2007)). Second, the Court considers whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out

a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct." (internal quotation marks omitted)). The Court may analyze these two prongs in any order. Pearson v. Callahan, 555 U.S. 223, 242 (2009); Underwood, 11 F.4th at 1328. Qualified immunity will shield the defendant official from civil liability if a plaintiff fails either prong of the analysis. Underwood, 11 F.4th at 1328.

### C. Plaintiffs' Section 1983 Fourth Amendment Excessive Force Claim Against Defendant Officers Allen and Hampel (Count I)

Defendants argue summary judgment is appropriate on the Section 1983 excessive force claims because: (1) there was no Fourth Amendment violation, and (2) Defendants Allen and Hampel are entitled to qualified immunity.

The Fourth Amendment prohibits the use of excessive force to make an arrest. Charles v. Johnson, 18 F.4th 686, 699 (11th Cir. 2021) (citation omitted). Accordingly, the Fourth Amendment's reasonableness standard governs claims that law enforcement officers have used excessive force during an arrest or a seizure. Graham, 490 U.S. at 395. In applying this standard, the Court must look at the totality of the circumstances surrounding the seizure. Tennessee v. Garner, 471 U.S. 1, 9 (1985); Charles, 18 F.4th at 699. This "requires careful attention to the facts and circumstances of each particular case, including the severity of

the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396 (citing Garner, 471 U.S. at 8–9). The force used to carry out an arrest "must be reasonably proportionate to the need for that force." E.g., Glasscox v. City of Argo, 903 F.3d 1207, 1214 (11th Cir. 2018) (citing Lee, 284 F.3d at 1198).[3]

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396 (citing Terry v. Ohio, 392 U.S. 1, 20–22 (1968)); see also Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003) ("We are loath to second-guess the decisions made by police officers in the field.").

---

[3] Glasscox was abrogated on other grounds by Gilmore v. Georgia Department of Corrections. 111 F.4th 1118 (11th Cir. 2024). Gilmore was then vacated and will be reheard en banc. No. 23-10343, 2024 WL 4379776 (11th Cir. Oct. 3, 2024). Thus, Glasscox is still the law of this Circuit. See, e.g., United States v. Sigma Int'l., Inc., 300 F.3d 1278, 1280 (11th Cir. 2002) (A vacated opinion has no precedential authority and "cannot be considered to express the view of this Court."); see also 11th Cir. R. 35-10.

Determining whether an officer's use of force is unconstitutionally excessive involves two steps. Charles, 18 F.4th at 699. First, the Court asks whether the specific kind of force used is categorically unconstitutional. Id. (citing Hope, 536 U.S. at 745-46). The Eleventh Circuit has repeatedly held the use of a taser is not categorically unconstitutional. Id. at 701. Thus, the Court's analysis will focus on the second step.

As for the second step, the Court evaluates the totality of the circumstances and then decides whether the amount of force used was excessive. Id.; Graham, 490 U.S. at 396 (citing Garner, 471 U.S. at 8-9). This inquiry is an objective one. Graham at 397. "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. (citations omitted). The Eleventh Circuit has distilled the evaluation of non-lethal use of force into six factors:

> (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted.

Wade v. Daniels, 36 F.4th 1318, 1325 (11th Cir. 2022) (citing Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1353 (11th Cir. 2015) (per curiam)). The Court must now weigh these factors with regard to Officers Hampel and Allen's actions.

13

### 1. Officer Hampel

It is undisputed that Officer Hampel deployed his taser on Cherry only once. Dkt. No. 40-17 ¶ 22. Beyond this, Officer Hampel used physical force—tackling and wrestling with Cherry—to restrain and handcuff him. Dkt. No. 28-3 at 01:25-01:48, 05:05-08:08. Plaintiffs' claim focuses on the use of the taser, so the Court's six-factor analysis does as well. Dkt. No. 1 ¶ 80.

First, regarding the severity of the alleged crime, Officer Hampel knew that Cherry was acting disorderly by running into traffic. Dkt. No. 33-1. Officer Hampel also knew the 911 caller reported a knife or crowbar in his hand. Id. This information alone does not indicate that Cherry committed a severe crime and thus does not weigh in favor of the use of force. See Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011) ("Disorderly conduct is not a serious offense" in the context of the excessive force analysis. (citation omitted)).

The second factor, whether Cherry posed an immediate threat, weighs in favor of the officers. Although Cherry dropped the metal object by the time Officer Hampel arrived, Cherry was still acting erratically by running away from the officers on a busy street. Dkt. No. 28-3 at 01:25-01:48. When Officer Hampel deployed his taser, Cherry was, at least, an immediate threat to himself and the nearby drivers. See Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir. 2004); Mercado v. City of Orlando, 407 F.3d 1152,

1157 (11th Cir. 2005) (considering the extent to which the suspect poses a threat to himself or herself under the second factor). Further, the officers were not familiar with Cherry. Despite now knowing that Cherry is not a violent man, at the time, the officers could see only a 5'11", 270-pound[4] grown man experiencing what appeared to be a drug-related or mental episode. Dkt. No. 38-10, Officer Hampel Dep. at 26:25-27:18. Cherry's erratic behavior paired with his size would lead a reasonable officer to believe that Cherry could physically overpower him. In fact, by the time Officer Hampel used his taser, Cherry had already overpowered the officers once when they tried to subdue him. Dkt. No. 28-3 at 01:30-01:48. Officers are "not required to wait and hope for the best before making the split-second decision to tase" a suspect. Baker v. City of Madison, 67 F.4th 1268, 1281 (11th Cir. 2023) (internal quotation marks and citation omitted).

The third factor, whether there was resistance or flight, weighs in favor of the officers. Cherry was running away from the officers at the time Officer Hampel used his taser. Dkt. No. 28-3 at 01:48-01:50. Plaintiffs argue that the third factor cuts in their favor because Cherry could not be resisting arrest when he

---

[4] In her deposition, Plaintiff Johnson stated that Cherry is now 306 pounds. Dkt. No. 28-5 at 46:18-20. Viewing the evidence in the light most favorable to the Plaintiffs, the Court accepts Plaintiffs' position that Cherry was approximately 270 pounds at the time of the incident. Dkt. No. 38-1 at 4.

was not under arrest. Dkt. No. 40 at 14. This is not convincing because (1) the officers were trying to seize Cherry to get him help, and (2) the Eleventh Circuit makes clear this factor involves "whether the suspect is actively resisting arrest *or* trying to flee." Wade, 36 F.4th at 1325 (emphasis added). The indisputable video evidence shows Cherry actively fleeing from the officers at the moment Officer Hampel deployed his taser. Dkt. No. 28-3 at 01:48-01:50.

As for the fourth factor, the need for the use of force, Defendants argue that "it was obvious that the officers could not take Cherry into custody without force" by the time the taser was used. Dkt. No. 28 at 19. While the officers could have tried to physically restrain Cherry a second time, Cherry was non-compliant with the officer's commands and was actively running away at the time of Officer Hampel's taser deployment.[5] Dkt. No. 28-3 at 01:48-01:50. Cherry had already overpowered both officers' attempt to

---

[5] Plaintiffs dispute the material fact that Cherry was ignoring officers' commands because he is mentally incapable of understanding and responding to such commands. Dkt. No. 38-20 at 6. The Court must conduct this analysis from a reasonable officer's perspective. Graham, 490 U.S. at 396.The officers saw that Cherry was not responsive to the commands to get on the ground, and at all relevant times, the officers would not have known that his disobedience was due to autism spectrum disorder (rather than a mental health crisis or drug-related crisis). See Dkt. Nos. 28-1 at 34:9-11, 37:14-17, 28-3 at 00:56, 02:01, 02:53, 38-10 at 26:25-27:18. Cherry's sister did not interact with the officers until after the last use of the taser. See Dkt. No. 28-3 at 05:35-05:48. Thus, the material fact that Cherry did not comply is undisputed; the reason for noncompliance is immaterial at this juncture.

tackle him by that point. Id. at 01:30-01:48. The Eleventh Circuit has held ignoring officers' commands, paired with unusual behavior, justifies the use of a taser. Hoyt v. Cooks, 672 F.3d 972, 976-79 (11th Cir. 2012), cert. denied, 568 U.S. 817 (2012). Thus, the fourth factor weighs in favor of Officer Hampel.

Fifth, and similarly, the Eleventh Circuit has found a justifiable relationship between the need for force and the amount of force used under similar facts: erratic behavior and non-compliance with officer commands in Hoyt, 672 F.3d at 976-79, Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008), and Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004). The cases in which the Eleventh Circuit has concluded that the situation did not justify taser use are distinguishable. See Glasscox, 903 F.3d at 1214 (11th Cir. 2018); Fils, 674 F.3d at 1289.

In Glasscox, the suspect was driving his pickup truck down the interstate in Alabama when he experienced an episode of diabetic shock. 903 F.3d at 1209. Physically unable to control his truck, the suspect began driving erratically at high speeds. Id. Concerned motorists reported the suspect's driving to law enforcement, and an officer responded and gave chase. Id. After the suspect's truck came to a stop in the median, the officer approached the truck and, while yelling at the suspect to get out, tased him four times in rapid succession. Id. The Eleventh Circuit held this constituted excessive force. Id. at 1213.

The key difference in Glasscox is the timing of the taser deployment. There, the suspect had clearly ceased resistance and was attempting to comply with the officer's commands to get out of the car. Id. at 1215. The suspect verbally stated that he was trying to get out of the car, and he was no longer trying to flee. Id. at 1211. In Cherry's case, Officer Hampel's use of force was during the period where Cherry was running away. Dkt. No. 28-3 at 01:48-01:50. Cherry had not ceased resistance, and a reasonable officer would not have known why Cherry was ignoring the commands to get on the ground. Thus, this case does not involve the use of force after the suspect has clearly ceased resistance and is, thus, distinguishable from Glasscox. See Glasscox, 903 F.3d at 1214 ("Even if the arrestee's resistance justified deployment of a taser initially, if he has 'stopped resisting . . . during this time period,' further taser deployments are excessive."); Wate v. Kubler, 839 F.3d 1012, 1021 (11th Cir. 2016) (repeated taser deployment after the suspect was handcuffed, quiet, and still); Fils, 647 F.3d at 1289 (unprovoked taser deployments on a non-hostile individual who was not disobeying any instructions); Oliver v. Fiorino, 586 F.3d 898, 908 (11th Cir. 2009) (multiple taser deployments after the suspect was immobilized and limp). This factor therefore weighs in favor of Officer Hampel.

Sixth, and finally, the Court considers the extent of injury inflicted. It is undisputed that Cherry had wounds from the taser

probes entering his skin, all of which his mother was able to treat at home without medical assistance. Dkt. No. 28-5 at 39:21-25. A cardiologist also evaluated Cherry to ensure that he had not suffered any heart damage from the shocks, and the cardiologist reported no heart issues. Id. at 40:1-14. Plaintiffs also assert that Cherry was too afraid to go outside for six months following the incident and still fears the police. Dkt. No. 38-2 ¶ 9.

Viewing the facts in the light most favorable to Plaintiffs, the Court understands that Cherry is traumatized from the incident and suffers from some psychological injury. The Eleventh Circuit has concluded that "physical injuries, including bleeding from the taser probes, and psychological injuries" are enough to support a finding of excessive force. Glasscox, 903 F.3d at 1212. Still, Cherry's injuries are on the lower end of the spectrum measuring seriousness of injuries in excessive force cases. See Wate, 839 F.3d at 1017 (finding taser deployments constituted excessive force where suspect suffered abrasions, contusions, lacerations, subgaleal hemorrhage and cerebral edema and eventually died from complications of asphyxia with contributory conditions of blunt trauma and restraint); Oliver, 586 F.3d at 906 (finding taser deployments constituted excessive force where officer tased suspect "at least" eight times, even when suspect was already lying on his back, and the suspect had blood coming out of his mouth, his body temperature rose to 107 degrees, and he ultimately died).

19

In sum, while the first and sixth factor weigh in favor of Plaintiffs, the remaining factors strongly favor Officer Hampel. Therefore, his use of force was not excessive, and there was no constitutional violation. Accordingly, Officer Hampel's motion for summary judgment as to the § 1983 excessive force claim against him is **GRANTED.**

**2. Officer Allen**

It is undisputed that Officer Allen tased Cherry at least three times during the encounter. Dkt. No. 38-20 at 21. The Court must now conduct the individualized six-factor inquiry for Officer Allen's use of force.

First, as to the severity of the crime, unlike Officer Hampel, Officer Allen posits that he witnessed Cherry commit the crime of assault. Dkt. No. 32 at 19-20. Under Georgia law, simple assault occurs when a person "[c]ommits an act which places another in reasonable apprehension of immediately receiving a violent injury." O.C.G.A. § 16-5-20(a)(2). This becomes aggravated assault when committed "with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." Id. § 16-5-21(a)(3). Georgia also imposes a greater punishment for assault on "a public safety officer" engaged in his or her official duties. Id. § 16-5-21(c)(3).

20

The indisputable body camera footage shows Cherry advancing towards Officer Allen with a long metal object. Dkt. No. 28-3 at 00:53-01:06. During this time, Officer Allen backs up and orders Cherry to drop the metal object five times. Id. While Cherry is not running or lunging towards Officer Allen, he is walking toward him. Id. At this time, Officer Allen believed the object to be a large wrench. Dkt. No. 28-1 at 35:23-25. The dispatch report identified a knife or crowbar, dkt no. 33-1, (of course, we now know it was an oversized spoon). Dkt. No. 38-2 ¶ 6.

Similar facts led the Eleventh Circuit to conclude a reasonable officer would have probable cause to arrest an individual for assault under Georgia law. Smith v. LePage, 834 F.3d 1285, 1294 (11th Cir. 2016) (holding that the use of a taser was constitutional). In Smith, the suspect carried a knife, repeatedly disobeyed the officers' commands to drop that knife, and "moved toward the officers" while holding the knife. Id. The same is true here because the dispatch report conveyed that Cherry had a knife or a crowbar and Cherry moved toward Officer Allen while disobeying the command to drop the object. Dkt. Nos. 28-3 at 00:53-01:06, 33-1. Therefore, in this case, a reasonable officer would be placed in apprehension of immediately receiving a violent injury as Cherry advanced with the metal object. Thus, the first factor weighs in favor of Officer Allen.

This interaction with Officer Allen also colors the Court's analysis of the second factor: whether the suspect poses an immediate threat to the safety of the officers or others. The dispatch report described a man "flipping out," running in the road, and hitting himself with a crowbar or a knife. Dkt. No. 33-1. This made Cherry an immediate threat to himself and other drivers. Further, once Officer Allen spoke to Cherry, Cherry immediately moved towards him with the metal object. Dkt. No. 28-3 at 00:53–01:06. After Cherry was not incapacitated by the first use of the taser, the Court need not assume that Officer Allen forgot the initial interaction with Cherry in which a reasonable officer could perceive Cherry as threatening. During the second and third taser deployments, Cherry continued to be an immediate threat to himself and the drivers because he would not get out of the road. Id. at 01:13–05:05. Like Officer Hampel, Officer Allen was physically overpowered by Cherry when the officers tried to use physical force—rather than the tasers—to tackle and subdue Cherry. Id. at 01:25–01:48. Therefore, from the officers' perspective, Cherry was an immediate threat to himself and others during the use of force.

The analysis for the third factor, whether there was resistance or flight, is functionally the same as for Officer Hampel. The first taser deployment occurred while Cherry was walking towards Officer Allen while resisting his commands. The

second and third taser deployments occurred while Cherry was trying to flee from the officers in disregard of their commands. Dkt No. 28-3 at 01:13-05:05.

As for fourth factor, the need for the use of force, and the fifth factor, the relationship between the need for force and the amount of force used, the Eleventh Circuit has explained that each deployment of a taser must be justified. See Glasscox, 903 F.3d at 1214; Wate, 839 F.3d at 1021 ("[W]hile the first or maybe even the second Taser deployment may have been warranted, . . . further shocks were unnecessary and grossly disproportionate."). "'The critical time period for purposes of determining' whether the repeated use of a taser on an arrestee 'constitutes unconstitutional excessive force spans just before the first activation through the time of the final taser deployment.'" Id. (alteration adopted) (quoting Wate, 839 F.3d at 1020). "Even if the arrestee's resistance justified deployment of a taser initially, if he has 'stopped resisting during this time period,' further taser deployments are excessive." Id. (alteration adopted). This warrants an analysis of the need and proportionality of the use of force for each time that Officer Allen tased Cherry.

When Officer Allen deployed his taser for the first time, a large man carrying a long metal object previously identified as a "knife or crowbar" was advancing towards him, despite having been ordered five times to "drop it." Dkt. Nos. 28-3 at 00:53-01:06,

23

33-1. Officer Allen waited until Cherry had advanced significantly to deploy the taser. Dkt. No. 28-3 at 01:07. Plaintiff is correct that Cherry did not lunge or swing at Officer Allen or make any verbal threats. Dkt. No. 38 at 3. Nevertheless, it is objectively reasonable that Officer Allen would view Cherry as an immediate threat as he was advancing towards him. This Circuit's precedent dictates that erratic behavior and non-compliance with officer commands justify this use of force. Hoyt, 672 F.3d at 976–79; Zivojinovich, 525 F.3d at 1073; Draper, 369 F.3d at 1278.

When Officer Allen deployed his taser the second time, the video shows that Cherry was actively retreating from Officer Allen while Officer Allen yelled at Cherry to get on the ground. Dkt. No. 28-3 at 01:13–01:25. While he had dropped the metal object at this point, Cherry was now attempting to flee in the eyes of a reasonable officer—posing a threat to himself and evading law enforcement. Again, the Eleventh Circuit has approved this use of force for ignoring officers' orders paired with unusual behavior. Hoyt, 672 F.3d at 976–79; Zivojinovich, 525 F.3d at 1073; Draper, 369 F.3d at 1278. At this moment, a reasonable officer would have still needed to apprehend Cherry to prevent him from running in the busy street or to get him medical attention based on the information relayed by the 911 operator.

The final time that Officer Allen successfully tased Cherry was after Cherry had physically overpowered both officers. Dkt.

24

No. 28-3 at 03:51–03:55. As Officer Hampel calmly attempted to put Cherry's arms behind his back to handcuff him, Cherry took off running. Id. The officers chased Cherry for a few seconds before Officer Allen tased him again. Id. at 03:59. Again, this is distinguishable from the cases where the Eleventh Circuit found use of a taser unreasonable because the suspect in those instances ceased resistance and attempted to comply with officers' commands. Glasscox, 903 F.3d at 1214; Wate, 839 F.3d at 1021.

Beyond these three "successful" taser deployments, Plaintiffs argue that Officer Allen's additional attempts to deploy his taser were unreasonable.[6] While the Court does not ignore the additional attempts to use force, this argument is unavailing. Because these attempts clearly did not have the desired effect of neuromuscular incapacitation (NMI), the calculus is the same. See Baker, 67 F.4th at 1280 (holding that the use of the taser was not a constitutional violation when "the body camera footage show[ed] that [the suspect] was not incapacitated by the taser"); Bussey-Morice v. Gomez, 587 F. App'x 621, 631 (11th Cir. 2014) (holding that the use of the

---

[6] Plaintiff objects to Defendants' reliance on a report prepared for the Glynn County Police Department by Axon, the manufacturer of the Taser energy weapons deployed by the officers, detailing the outcome of each attempted discharge. Dkt. No. 33-2. The Court does not need to rely on this report because it is abundantly clear from the body-worn camera footage which taser deployments affect Cherry. See Bussey-Morice, 587 F. App'x at 631. Further, at the hearing on this motion, Defendants affirmed that this report can be presented in admissible form. See Fed. R. Civ. P. 56(c)(2).

taser did not violate the suspect's clearly established constitutional rights where the taser "appeared to have little to no effect on [the suspect] as he continued to fight and struggle").[7]

Further, there were no attempts to tase Cherry after he was on the ground while the officers handcuffed him. Dkt. No. 28-3 at 05:05-08:08. Thus, the unsuccessful attempts are again distinguishable from the "gratuitous" use of force in Glasscox, 903 F.3d at 1214 (repeated taser deployments after resistance had ceased), Wate, 839 F.3d at 1021 (repeated taser deployments after the suspect was handcuffed, quiet, and still), and Oliver, 586 F.3d at 908 (multiple taser deployments after the suspect was immobilized and limp).

Finally, and again, "physical injuries, including bleeding from the taser probes, and psychological injuries" are enough to support a finding of excessive force. Glasscox, 903 F.3d at 1212.

---

[7] Plaintiffs argue that Cherry still felt pain from the unsuccessful taser attempts. Dkt. No. 38-20 at 6-16. However, even when viewing the facts in the light most favorable to the nonmovant, the Court "should. . .view[] the facts in the light depicted by the videotape." Scott, 550 U.S. at 380-81. In the clear video footage, Officer Allen deploys his taser five times resulting in no visible effect on Cherry. Dkt. No 28-3 at 01:48, 01:58, 02:46, 04:38, 04:54. Plaintiffs do not dispute that Officer Allen suspected that his taser was malfunctioning. Dkt. No. 38-20 at 13. Thus, the Court does not ignore these five additional attempts in the use of force analysis, but they do not change the outcome because all five were during the "critical" period in which Cherry disobeyed commands, fled, and/or acted erratically. See Wate, 839 F.3d at 1020; Dkt. No. 28-3 at 00:53-05:05.

Thus, the sixth factor weighs in favor of a finding of excessive force unlike the first five factors.

After weighing the factors, the Court concludes Officer Allen's use of force was not excessive because he did not deploy his taser at any point in the interaction when Cherry was not acting erratically, actively fleeing, or resisting the officers' use of physical force. Accordingly, Officer Allen's motion for summary judgment as to Plaintiffs' § 1983 excessive force claim is **GRANTED**.

The Court's analysis of the § 1983 excessive force claim could end here. However, to be thorough, the Court examines a second reason for granting summary judgment of this claim; the law at the time of this incident did not clearly signal to every reasonable officer that the conduct was unconstitutional.

### 3. Clearly Established Law

Because the Court concludes neither Officer Hampel nor Officer Allen violated the Fourth Amendment with their use of force, Plaintiffs cannot meet their burden to show that qualified immunity does not apply under the two-prong Saucier v. Katz test. 533 U.S. at 194. Nevertheless, Plaintiffs argue that the rights at issue here were clearly established, and the Court considers whether the officers are entitled to qualified immunity on the second prong as well. Underwood, 11 F.4th at 1328 ("Although [the court] can analyze these two questions in any order, and a finding

that one is not present is enough to grant qualified immunity," it is "important to give due weight to each consideration in order to avoid insulating liability for wrongful conduct in the future." (internal citation omitted)). The Court now asks "whether the right at issue was clearly established at the time of the defendant's alleged misconduct." Underwood, 11 F.4th at 1328.

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018) (internal quotation marks omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). "In other words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" Id.

In the Eleventh Circuit, there are three ways to show that the law is clearly established. Edger v. McCabe, 84 F.4th 1230, 1235 (11th Cir. 2023). They are as follows:

> First, a plaintiff may show that a "materially similar case has already been decided," whose facts are similar enough to give the police notice. See Keating v. City of Miami, 598 F.3d 753, 766 (11th Cir. 2010). Second, he may show that a "broader, clearly established principle should control the novel facts" of his case. Id. This "broader" principle may be derived from "general statements of the law contained within the Constitution, statute, or caselaw." Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005) (alteration adopted) (quoting Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003)). Finally, a plaintiff may show that the officer's conduct "so

> obviously violates [the] constitution that prior case
> law is unnecessary." <u>Keating</u>, 598 F.3d at 766 (quoting
> <u>Mercado</u>, 407 F.3d at 1159).

<u>Id.</u> There is no requirement that a case be directly on point for a right to be clearly established, but the Court must be mindful of the specific context of the case. <u>Rivas-Villegas v. Cortesluna</u>, 595 U.S. 1, 7-8 (2021) (citing <u>White v. Pauly</u>, 580 U.S. 73, 79 (2017)).

"Because § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." <u>Alcocer v. Mills</u>, 906 F.3d 944, 951 (11th Cir. 2018) (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam) (internal citation omitted)). The Court "must be careful to evaluate a given defendant's qualified-immunity claim, considering only the actions and omissions in which that particular defendant engaged." <u>Id.</u>

When analyzing the complex issues that arise in § 1983 litigation where defendants have asserted qualified immunity defenses at the summary judgment stage, it is critical to reiterate that the Rule 56 standard still governs. If genuine disputes of material fact exist, the Court cannot grant summary judgment. Fed. R. Civ. P. 56. In this case, there is no dispute that Defendant Officers Allen and Hampel were acting within the scope of their

discretionary authority at all relevant times. See Dkt. Nos. 38, 40. Plaintiffs, therefore, have the burden to show that Defendants are not entitled to qualified immunity because the unlawfulness of their conduct was "clear enough" that every reasonable official would know such conduct would violate the law. See Wesby, 583 U.S. at 63. Plaintiffs advance arguments for all three methods of showing clearly established law. See Dkt. Nos. 38, 40; see also Edger, 84 F.4th at 1235.

### i.   **Obvious Constitutional Violation**

Plaintiffs first argue that the constitutional violation here is "so clear 'that case law is not needed to establish that the conduct cannot be lawful.'" Dkt. Nos. 38 at 19, 40 at 17 (citing Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002)).

To prevail on the argument that the conduct is obviously unlawful, "a plaintiff must show that the official's conduct 'was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point.'" Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000) (alteration adopted) (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)). Plaintiffs' argument does not succeed.

The Eleventh Circuit has upheld the use of a taser after a suspect disregards an officer's orders and acts erratically. Hoyt, 672 F.3d at 976–79; Zivojinovich, 525 F.3d at 1073; Draper, 369

F.3d at 1278. Hoyt, for example, provided the Defendant Officers adequate notice that an even greater level of force is allowable. 672 F.3d at 975–79. In Hoyt, the suspect told the officer that he was a demon who needed to be killed. Id. at 975. The suspect then "lunged" at the officer through the open window of the patrol car; the officer accelerated to dislodge the suspect. Id. Thereafter, the suspect crawled towards the officer, who ordered him to lie down and be still while the officer awaited back-up. Id. The suspect obeyed and laid down. Id. When back-up arrived, the first officer repeatedly ordered the suspect, who was still lying on the ground, to place both his hands behind his back. Id. However, the suspect "would place just his one hand behind his back while keeping the other hand outstretched." Id. When the suspect resisted, rolled on the ground, and refused to be handcuffed, the two officers tased the suspect several times: one time in prong mode and at least five times in stun mode.[8] Id. at 975–76. Once handcuffed and secured, the suspect became unresponsive in the patrol car and later died in the ambulance on the way to the hospital. Id. at 976.

---

[8] "Stun mode" enables the officer to place the taser directly against the suspect's skin to produce a burning sensation. Hoyt, 672 F.3d at 975. Between the two modes, the officers tased the suspect "at least six times, and possibly as many as eighteen times." Hoyt v. Bacon Cnty., No. 5:09-CV-026, 2011 WL 13180247, at *1 (S.D. Ga Jan. 26, 2011).

Since the Hoyt decision, no holding of the Eleventh Circuit or the United States Supreme Court has foreclosed the use of taser guns when a suspect actively resists arrest. See, e.g., Charles, 18 F.4th at 700–02 (affirming the grant of qualified immunity where an officer tased a suspect who actively navigated his arms and body away from the deputy to avoid being handcuffed (citing Hoyt, 72 F.3d at 980)); Callwood v. Jones, 727 F. App'x 552, 560 (11th Cir. 2018) (reaffirming Hoyt's refusal "to extend Oliver's holding when officers tased the suspect after he fell to the ground because he 'continued to pose a danger' and 'never ceased his vigorous resistance to the attempts to handcuff him'" (quoting Hoyt, 672 F.3d at 978–80)); Bussey-Morice, 587 F. App'x at 631 (reversing denial of qualified immunity because the clearly established law did not preclude the officers from deploying their tasers after the suspect acted aggressively, refused to comply with the repeated commands given by the officers attempting to restrain him, and the application of the officers' tasers appeared to have little or no effect on the suspect as he struggled (citing Hoyt, 672 F.3d at 975–80)).

As the Eleventh Circuit has observed, the "dividing point between excessive and non-excessive force" in this area of the law "turns on whether the suspect is completely restrained or otherwise resisting arrest" when the officer deploys the taser. Callwood, 727 F. App'x at 560. Other cases "clearly establish[] that the

32

repeated tasing of a suspect who had *ceased* any resistance was unlawful." Glasscox, 903 F.3d at 1218 (emphasis added); see also Saunders v. Duke, 766 F.3d 1262, 1265 (11th Cir. 2014) (The Eleventh Circuit has "repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands."). Such cases involve a suspect's clear attempts to comply as in Glasscox or an officer's use of force against a suspect who is already immobilized as in Oliver, 586 F.3d at 903 (eight shocks after suspect was on the ground lying flat). Neither situation applies here because Cherry never attempted to comply with the officers' commands and never became immobilized at any point during which a taser was used.

### ii. Broad Statements of Principle

Second, Plaintiffs argue "multiple cases provide 'broad statements of principle' establishing that the use of force causing severe pain against suspects who pose no immediate threat violates the Fourth Amendment." Dkt. No. 38 at 19 (citing Priester, 208 F.3d at 927; Vinyard v. Wilson, 311 F.3d at 1347-48; Fils, 647 F.3d at 1292). In Priester, the Eleventh Circuit held that it was unconstitutional for police officers to allow a dog to bite and hold a suspect for two minutes where that suspect submitted to the defendant-officer's every command and was lying flat on the ground,

not resisting arrest. 208 F.3d at 923-24, 927. In Vinyard, the
officer grabbed a petite drunk woman, who was handcuffed in the
back of his police car, "forcibly enough to bruise her arm and
breast and then us[ed] pepper spray" on her; this "plainly
constituted unreasonable and excessive force." 311 F.3d at 1349.
In Fils, the individual was tased "even though he committed at
most a minor offense; he did not resist arrest; he did not threaten
anyone; and he did not disobey any instructions (for none were
given)." 647 F.3d at 1292. In Fils, the court held that where the
individual "showed no hostility to the [officers], did not disobey
any orders, and did not make any menacing gestures. . ., no
reasonable officer could ever believe that it was appropriate to
shoot his taser probes into [the individual] and shock him." Id.
While it is true this line of cases established that non-lethal
force, such as dog bites, pepper spray, and taser use, "is
excessive where the suspect is non-violent and has not resisted
arrest[,]" here, Cherry did not comply with any of the officers'
orders and consistently wrestled and ran from the officers
throughout the interaction. See id. (citing Priester, 208 F.3d at
927; Vinyard, 311 F.3d at 1347–48). Put differently, the
throughline of those cases is unprovoked force against a compliant,
non-threatening individual; in this case, Cherry was not compliant
or obedient, and he posed a threat to himself and others. Thus,
the broad principle found in these cases does not apply here.

### iii. Materially Similar Case

Third, Plaintiffs argue that a specific Eleventh Circuit case has clearly established that the use of a taser in an unreasonable manner is unconstitutional. Dkt. No. 38 at 19 (citing Stryker v. City of Homewood, 978 F.3d 769, 775 (11th Cir. 2020) ("[A]t the time of the incident [in 2014] it was clearly established that using violent force generally, and a taser specifically, on a compliant, nonaggressive, and nonthreatening misdemeanant violates the Fourth Amendment.")). Styker, however, is not a factual analogue to this case. See Hope, 536 U.S. at 741 (When the law "leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary."); Wesby, 583 U.S. at 64 ("Specificity" is "especially important in the Fourth Amendment context." (quoting Mullenix v. Luna, 577 U.S. 7, 13 (2015) (per curiam)).

In Stryker, an officer was dispatched to a Walmart parking lot for a traffic incident. 978 F.3d at 771. Without any provocation, the officer "shoved [Stryker], shot him in the back with the taser, and kicked him once he fell to the ground—even though Stryker posed no threat and was (at the time of the taser use) complying with the officer's instructions." Id. at 774. Thus, the features that made the taser use in Stryker unconstitutional— namely, Stryker's compliant, nonthreatening behavior—are not

35

present here. See id. at 775 (The Eleventh Circuit has not held that "tasing a cooperative, nonthreatening misdemeanant in the back is an appropriate means of effecting an arrest. Quite the opposite. [Instead, it has] explicitly held—and thus clearly established—that employing a taser on a compliant, nonthreatening suspect violates the Constitution." (citing Fils, 647 F.3d at 1288–89)). Similar to the broad principle argument, the reliance on Stryker is unavailing because the cornerstone of the decision is the compliant, nonthreatening nature of the suspect.

The crux of Plaintiffs' argument is that Cherry is different from other non-compliant suspects because it was "obvious" to the officers that Cherry was "unable to comprehend" the officer's orders and thus he was incapable of being non-compliant. Dkt. No. 38 at 20–21. This argument fails for two reasons. First, the Court must conduct the use of force analysis from a reasonable officer's perspective, Graham, 490 U.S. at 396, and the Court finds no "obvious" indicators that the officers would have known Cherry's non-compliance was due to autism spectrum disorder. See Dkt. Nos. 28-1 at 34:9-11, 37:14-17, 28-3 at 00:56, 02:01, 02:53, 38-10 at 26:25-27:18. Second, the Eleventh Circuit has instructed that, at the summary judgment stage, where a clear "video obviously contradicts Plaintiff's version of the facts," the Court must "accept the video's depiction instead of Plaintiff's account." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2010);

see also Scott, 550 U.S. at 380-81 (When viewing the light in favor
of the nonmovant would have required the Court to rely on "visible
fiction," the Court "should have viewed the facts in the light
depicted by the videotape."); Baker, 67 F.4th at 1277-78. The
clear, unobstructed video does not show any "obvious" indicators
of Cherry's autism until his sister arrives—after the use of force.
Dkt. No. 28-3 at 05:35. Instead, the footage shows that when
Officer Allen deployed his taser for the first time, a large man
carrying a long metal object previously identified as a "knife or
crowbar" was advancing towards him, despite having been ordered
five times to "drop it." Id. at 00:53-01:07, Dkt. No. 33-1. At all
times thereafter, Cherry was either physically struggling with the
officers, failing to comply with their verbal commands, or
attempting to flee in the busy roadway. Dkt. No. 28-3 at 01:08-
05:05. The video shows that it was not "obvious" to the officers
that Cherry was non-verbal or unable to comprehend; the video also
shows the officers trying to figure out whether Cherry was amidst
a medical or mental health crisis and attempting to help him. See
id. Therefore, this case does not fit under the law clearly
establishing that the use of unprovoked force on compliant,
obedient individuals is excessive.

Plaintiffs have not shown that (1) the officer's conduct so
obviously violates the constitution that prior case law is
unnecessary, (2) a broader, clearly established principle should

control the novel facts of this case, or (3) a materially similar case has already been decided, whose facts are similar enough to give the police notice. See Edger, 84 F.4th at 1235. Thus, Officers Allen and Hampel are entitled to qualified immunity under both prongs of the Saucier v. Katz test, and their motion for summary judgment as to Plaintiffs' § 1983 excessive force claim is **GRANTED**.

**D. Plaintiffs' Section 1983 Fourth Amendment Failure to Intervene Claim Against Defendant Officer Hampel (Count I)**

An officer has a duty to intervene to stop the use of excessive force if: (1) he is in a position to do so and (2) refuses to do so. Priester, 208 F.3d at 926. Defendant Hampel argues that Plaintiffs cannot pursue a failure to intervene claim because failure to intervene is a separate and independent cause of action that Plaintiff did not assert in the complaint, and Plaintiff cannot amend his complaint to add a new claim in his response to Officer Hampel's motion for summary judgment. Dkt. No. 45 at 9.

The Eleventh Circuit has allowed a plaintiff to advance a failure to intervene theory of liability within a § 1983 excessive force claim without pleading the failure to intervene as a separate cause of action. Lepone-Dempsey v. Carroll Cnty. Comm'rs, 159 F. App'x 916, 919 (11th Cir. 2005). Nevertheless, Plaintiffs do not put forth any facts in the complaint to support a claim, or a secondary theory of liability, that Officer Hampel was in a

position to stop Officer Allen from using the taser on Cherry or that Officer Hampel refused to do so. Instead, the undisputed facts show that because Officer Allen's use of the taser did not constitute excessive force, see supra Section I.C.2, Officer Hampel had no obligation to intervene. See Crenshaw v. Lister, 556 F.3d 1283, 1294 (11th Cir. 2009) (explaining that there is "no attendant obligation to intervene" if the other officer's force is not excessive). Thus, Officer Hampel's motion for summary judgment as to Plaintiffs' failure to intervene claim is **GRANTED**.

### E. Plaintiffs' Section 1983 Fourth Amendment Municipal Liability Claim Against Defendant Glynn County (Count III)

Municipalities and other local government entities are considered "persons" under § 1983. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978). The Supreme Court, however, "has placed strict limitations on municipal liability under § 1983." Grech v. Clayton Cnty., 335 F.3d 1326, 1329 (11th Cir. 2003). "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell, 436 U.S. at 691. This is because "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." Id. Put differently, a local

government "will be liable under section 1983 only for acts for which the local government is actually responsible." Marsh v. Butler Cnty., 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc) (citing Turquitt v. Jefferson Cnty., 137 F.3d 1285, 1287 (11th Cir. 1998)).

Municipal liability attaches only where the local government's custom or policy caused its employee to violate the plaintiffs' constitutional rights. Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (citations omitted). "[T]o impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom[9] or policy[10] that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)); see also Scott v. Miami Dade Cnty., No. 21-13869, 2023 WL 4196925, at *8 (11th Cir. June 27, 2023) (applying the three McDowell requirements to a § 1983 supervisory liability claim against a county).

---

[9] "A custom is a practice that is so settled and permanent that it takes on the force of law." Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (citation omitted).

[10] "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." Id. (alteration adopted).

The threshold requirement for a municipal liability claim is a constitutional violation. McDowell, 392 F.3d at 1289. The officers' use of force was justified in this case; thus, there is no constitutional violation.[11] See Section I.C. Even so, Plaintiffs' Monell claim fails on another alternate ground.

In this case, Plaintiffs' Monell claim primarily hinges on a failure to train. Dkt. No. 38 at 12. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011). The failure to train must "reflect[] a 'deliberate' or 'conscious' choice by a municipality." City of Canton, 489 U.S. at 389. "To establish a deliberate or conscious choice or such deliberate indifference, a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold, 151 F.3d at 1350. "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for

---

[11] Plaintiffs also argue that Glynn County should be held liable under a theory of ratification. Dkt. No. 38 at 21–23. "[A] police department's 'persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct' and is therefore subject to liability under § 1983." Underwood, 11 F.4th at 1333 (quoting Salvato v. Miley, 790 F.3d 1286, 1297 (11th Cir. 2015)). Because there is no unconstitutional conduct to ratify and no allegations of *persistent* failures to discipline officers, this theory of liability does not prevail.

purposes of failure to train." Connick, 563 U.S. at 62 (internal quotation marks and citation omitted).

Plaintiffs argue that Glynn County did not provide adequate training on interactions with suspects with mental disabilities or use of tasers. Dkt. No. 38 at 21–24. Plaintiffs cite only to this incident as an example of such failure to train. See id. Viewing all the facts in the light most favorable to Plaintiffs, Glynn County knew of the need to train on dealing with suspects with mental disabilities and on the use of tasers. Plaintiffs, however, cannot point to any evidence that shows a deliberate choice not to train. See id. (citing Dkt. No. 38-9, Glynn County 30(b)(6) Dep.).

Glynn County officers were required to receive annual training regarding interacting with people who have mental disabilities, and there were two online courses that would satisfy that requirement during the relevant time. Dkt. No. 38-9 at 11. In an attempt to show this training was not enforced, Plaintiffs point to the fact that a new policy requires officers to take an autism and de-escalation online course. Dkt. No. 38 at 7. This argument does not connect the new policy requiring an additional course with the proposition that the old policy allowing for two different trainings was not enforced. No reasonable inference can be drawn from the evidence to show Glynn County made a deliberate choice not to train on mental disabilities.

42

Glynn County officers are also required to complete taser training: an initial eight-hour course and a one-hour "refresher" course annually. Dkt. No. 38-9 at 10. Plaintiffs likewise do not point to any evidence that this training requirement was not enforced. Plaintiffs do not put forth a pattern of similar constitutional violations by untrained employees related to use of tasers or mentally disabled suspects as is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train. See Connick, 563 U.S. at 62. Simply pointing to the use of tasers in this case is insufficient. See Dkt. No. 38 at 21–24.

There are no material disputes of fact about the required training for Glynn County officers. Because there is no underlying constitutional violation and no evidence showing a deliberate choice not to train, Glynn County's motion for summary judgment as to Plaintiffs' Monell claim is **GRANTED.**

## II. Plaintiffs' Americans with Disabilities Act & Rehabilitation Act Claim Against Glynn County (Counts IV, V, VI)

Next, Plaintiffs assert two theories of liability under the Americans with Disabilities Act ("ADA") and Rehabilitation Act ("RA"): (1) that Glynn County failed to make reasonable modifications to policies and procedures for mental illness crises; and (2) that Glynn County failed to provide reasonable

accommodations during the interaction with Cherry for his autism.[12] Dkt. No. 1. ¶¶ 101–38.

Defendants argue that the complaint contains no reference to the "Public Services" subchapter, on which an ADA claim arising from an arrest would be premised. Dkt. No. 32 at 36; see also Dkt. No. 1 (citing 42 U.S.C. §§ 12112 to 12117 (Title I, Employment)). Plaintiffs respond that the Eleventh Circuit has not decided whether the provisions cited in the complaint apply to law enforcement. Dkt. No. 38-20 at 23. Plaintiffs are correct that the Eleventh Circuit has not entered "the circuits' debate about whether police conduct during an arrest is a program, service, or activity covered by the ADA." Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1084 (11th Cir. 2007). Instead, in this circuit, plaintiffs may "attempt to show an ADA claim under the final clause in the Title II statute." Id. (citing 42 U.S.C. § 12132). This is because "the final clause of § 12132 'protects qualified individuals with a disability from being "subjected to discrimination by any such entity," and is not tied directly to the "services, programs, or activities" of the public entity.'" Id. at 1085 (quoting Bledsoe v. Palm Beach Cnty. Soil & Water

---

[12] The same standards govern ADA and RA claims; as such, courts analyze these claims together. Silberman v. Miami Dade Transit, 927 F.3d 1123, 1133 (11th Cir. 2019); Allmond v. Akal Sec. Inc., 558 F.3d 1312, 1316 n.3 (11th Cir. 2009) (Courts "discuss [ADA and RA] claims together and rely on cases construing those statutes interchangeably.").

Conservation Dist., 133 F.3d 816, 821-22 (11th Cir. 1998) (quoting

42 U.S.C. § 12132)). This "catch-all" clause "prohibits all

discrimination by a public entity, regardless of the context." Id.

(quoting Bledsoe, 133 F.3d at 822). In any event, a citation to

the wrong provision of a statute is not proper grounds for

dismissal. See Librizzi v. Ocwen Loan Servicing, LLC, 120 F. Supp.

3d 1368, 1374 (S.D. Fla. 2015) ("[D]ismissal of Plaintiff's Amended

Complaint solely on the basis that [Plaintiff] cited the wrong

provision of a statute is not proper—where other provisions of the

same statute do apply to Defendants."); cf. Guadarrama v. United

States AG, 97 F.4th 750, 755 (11th Cir. 2024) (For purposes of

appellate review, even if the lower tribunal cited the wrong

authority, what matters is if in substance, it applied the wrong

legal standard.). The Court finds that Plaintiffs' claims fall

under Title II, and the Court follows the Eleventh Circuit's

analysis in Bircoll. See Dkt. No. 1 at 15 ("Glynn County was a

public entity subject to the requirements of Title II of the

Americans with Disabilities Act of 1990. . ..") ; 480 F.3d at 1081–

83.

Title II of the ADA provides that "no qualified individual

with a disability shall, by reason of such disability, be excluded

from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to

discrimination by any such entity." 42 U.S.C. § 12132; accord

_Bircoll_, 480 F.3d at 1081. A "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). Under Title II, a public entity's failure to provide a reasonable accommodation or modification constitutes discrimination.[13] _See Bircoll_, 480 F.3d at 1085; _Rylee v. Chapman_, 316 F. App'x 901, 906 (11th Cir. 2009). A plaintiff seeking compensatory damages from a public entity, as is the case here, must also prove that the lack of accommodation or modification was due to "intentional discrimination." _Silberman_, 927 F. 3d at 1134.

**A. Reasonable Modifications**

The regulations implementing Title II's prohibition against discrimination provide that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate

---

[13] In allowing the plaintiff to proceed under Title II, the _Bircoll_ court noted there is no statutory language in Title II including "reasonable accommodations" or "reasonable modifications" in the definition of discrimination like in Title I and Title III, respectively. 480 F.3d at 1082 n.13. "However, the DOJ regulations for Title II impose the requirement of 'reasonable modifications' to procedures to avoid the discrimination prohibited by Title II." _Id._ Later Eleventh Circuit opinions have further allowed plaintiffs to proceed on a reasonable accommodations theory to prove discrimination during an arrest. _See Charles_, 18 F.4th at 703.

that making the modifications would fundamentally alter the nature of the service, program, or activity." Id. § 35.130(b)(7)(i). Title II does not require a public entity to employ "any and all means" to make services accessible to persons with disabilities, but only to make reasonable modifications that do not "impose an undue burden." Bircoll, 480 F.3d at 1082 (citing Tennessee v. Lane, 541 U.S. 509, 531-32 (2004)). The Court considers the "exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene" when evaluating the reasonableness of the requested ADA modification. Id. at 1085.

Glynn County is entitled to summary judgment on Plaintiffs' ADA and RA claims for three reasons. First, Plaintiffs' reasonable modifications claim is not premised on a qualifying disability. Plaintiffs argue that Glynn County failed to make reasonable modifications to policies and procedures for "mental health crises," not specifically for autistic individuals. See Dkt. No. 1 ¶ 107. The Eleventh Circuit has held "an acute mental health crisis is a 'transitory' impairment and thus does not qualify as a disability" under the ADA and RA. Foulke v. Weller, No. 22-13942, 2024 WL 2761778, at *10 (11th Cir. May 29, 2024) (quoting 42 U.S.C. § 12102(3)(B)).

Second, Plaintiffs have not met their burden to show the request for a modification to law enforcement procedures was reasonable. See Schaw v. Habitat for Humanity of Citrus Cnty.,

Inc., 938 F.3d 1259, 1265 (11th Cir. 2019) ("A plaintiff carries the initial burden of showing that his proposed accommodation is reasonable."). The underlying police encounter involved the onerous task of getting Cherry out of the roadway for his and others' safety. See Bircoll, 480 F.3d at 1086. Responding to a 911 call that a man is in the road hitting himself with a crowbar or knife involves "exigencies that necessitate prompt action for the protection of the public" and most of all, protection of Cherry himself. See id. Plaintiffs have made no showing that the request for a modification to procedures to "de-escalate mental health crises" would be reasonable, given the facts of this case, where the officers responded to protect Cherry from harm to himself and drivers, and Cherry appeared unresponsive to the officer's attempts to communicate verbally. Dkt. No. 1 ¶ 115.

Lastly, Plaintiffs have failed to show any intentional discrimination against Cherry by the Defendant Officers. The undisputed video evidence shows that Officer Allen initially tried to speak to Cherry calmly to de-escalate the situation and get Cherry out of the roadway. Dkt. No. 28-3 at 00:46-00:48. The officers repeat statements such as "we can get you help" and "we are trying to help you" throughout the interaction. Id. at 02:13, 02:53, 03:00. The officers called him "buddy" and continuously followed him to prevent him from getting hit by the passing cars in the dark road. Id. at 03:06, 03:41. This conduct does not show

intentional discrimination by Glynn County against individuals with mental health crises. Instead, it shows the officers attempting to de-escalate the situation and get Cherry help. The fact that Glynn County later implemented more robust mental health training is not probative of any wrongdoing in this case. See Dkt. Nos. 38 at 7, 30, 38-12; see also Columbia & Puget Sound R.R. Co. v. Hawthorne, 144 U.S. 202, 207 (1892) ("[T]he taking of such precautions against the future is not to be construed as an admission of responsibility for the past, [and] has no legitimate tendency to prove that the defendant had been negligent before the [incident] happened."). Therefore, Plaintiffs' ADA and RA claims against Glynn County for the failure to make reasonable modifications to policies and procedures for mental health crises fail as a matter of law, and summary judgment is **GRANTED** as to this claim.

### B. Reasonable Accommodations

To recover for a public entity's failure to provide reasonable accommodations, "a plaintiff must establish: '(1) that he is a qualified individual with a disability, (2) that he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity or otherwise discriminated against by such entity, (3) by reason of such disability.'" Charles, 18 F.4th at 702 (quoting Shotz v. Cates, 256 F.3d 1077, 1079 (11th Cir. 2001) (alterations adopted)

(quotation marks omitted) (quoting 42 U.S.C. § 12132) (analyzing reasonable accommodations in an arrest case)). "Of course, 'the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" Id. (quoting Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999)).

Plaintiffs assert that "Glynn County is vicariously liable for Defendants Allen and Hampel's failure to make reasonable accommodations for [Cherry's] disability." Dkt. No. 1 ¶ 132. However, the Eleventh Circuit law is clear: "vicarious liability is unavailable under Title II" of the ADA or the RA. Ingram v. Kubik, 30 F.4th 1241, 1258 (11th Cir. 2022).

Rather, Title II "requires the deliberate indifference of an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the entity's behalf and who has actual knowledge of discrimination in the entity's programs and fails adequately to respond." Id. at 1259 (alteration adopted) (emphasis omitted) (quoting Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 349 (11th Cir. 2012)). Deliberate indifference "requires proof that 'the defendant knew that harm to a federally protected right was substantially likely and failed to act on that likelihood.'" Silberman, 927 F.3d at 1134 (alteration adopted) (quoting Liese, 701 F.3d at 344).

50

Even when viewing the facts in Plaintiffs' favor, Defendant Glynn County is entitled to summary judgment on the reasonable accommodations claim because Plaintiffs have not shown that Defendants (1) acted with deliberate indifference or (2) knew of any alleged discrimination against Cherry or even knew of Cherry's disability.

First, Plaintiffs propose that Defendants should have accommodated Cherry's disability by turning off their flashing lights, avoiding shining lights in Cherry's eyes, speaking calmly instead of shouting, and observing Cherry while protecting him and bystanders, rather than using a taser. Dkt. No. 38 at 34. The undisputed facts, however, show that Officer Allen initially spoke to Cherry calmly. Dkt. No. 28-3 at 00:46-00:48. As the interaction continued and Cherry did not comply with the order to get on the ground, the officers continuously say phrases like "we can get you help" and "we are trying to help you." Id. at 02:13, 02:53, 03:00. The officers called Cherry "buddy" and blocked him from the path of the cars. Id. at 03:06, 03:41. Again, this conduct does not amount to deliberate indifference to Cherry's autism or intentional discrimination against Cherry. Instead, the indisputable video evidence shows the officers adapting to Cherry as they interacted with him to get him help from whatever mental or physical crisis he was facing. See Dkt. Nos. 28-3, 28-4.

Second, a defendant "cannot be liable for refusing to grant a reasonable and necessary accommodation if [it] never knew the accommodation was in fact necessary." Schwarz v. City of Treasure Island, 544 F.3d 1201, 1219 (11th Cir. 2008) (citation omitted). "[T]his means that the defendant must know or reasonably be expected to know of the existence of both the handicap and the necessity of the accommodation." Hawn v. Shoreline Towers Phase 1 Condo. Ass'n, Inc., 347 F. App'x 464, 467 (11th Cir. 2009); see also Rebalko v. City of Coral Springs, 552 F. Supp. 3d 1285, 1330 (S.D. Fla. 2020) (denying similar request for reasonable accommodation during arrest). Because the Defendant Officers and Glynn County did not know of Cherry's autism until his sister arrived, the officers cannot be held liable. See Dkt. No. 28-3 at 05:35–05:48. Plaintiffs point to evidence that shows, after the encounter, the officers knew that Cherry was autistic; this is not enough to show actual knowledge of discrimination in the Glynn County's programs and failure to adequately to respond. See Dkt. No. 38-19 at 01:40. Instead, at the time of the incident, the video evidence shows the officers did not know whether Cherry was experiencing excited delirium, a drug-induced medical episode, or a mental health crisis until his sister arrived on the scene—after the use of the taser. See Dkt. Nos. 28-1 at 34:9–11, 37:14–17 (Officer Allen first thought this was "an intoxication or drugs" situation and shortly thereafter, thought Cherry "had signs of

using some type of drug or excited delirium."), 28-3 at 00:56, 02:01, 02:53, 05:35–05:48 (bystanders stating that Cherry is "mental health" and sister arriving), 38-10 at 26:25–27:18 (Officer Hampel explaining that Cherry exhibited the "same behavior" as those "intoxicated, on narcotics, or on alcohol" or "excited delirium").

Thus, Plaintiffs' ADA and RA claims against Glynn County for the failure to make reasonable accommodations fail as a matter of law, and summary judgment is **GRANTED** as to these claims.

## III.  Plaintiffs' State Law Claims for Battery and Assault Against All Defendants

After granting summary judgment on Plaintiffs' § 1983 and ADA and RA claims against Defendants—the only federal claims in this action—the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims which lack an independent jurisdictional basis. See 28 U.S.C. § 1367(c)(3) (permitting a court to decline exercising supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); see also Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088–89 (11th Cir. 2004) ("The decision to exercise supplemental jurisdiction over pendant state claims rests within the discretion of the district court. We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial." (internal citations omitted)); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)

("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

The Court, therefore, **DISMISSES without prejudice** Plaintiffs' state law claims. See Carnegie-Mellon Univ., 484 U.S. at 350 ("[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." (citing Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966)) (footnote omitted)); see also Smith v. Franklin Cnty., 762 F. App'x 885, 891 n.3 (11th Cir. 2019) (affirming the district court's dismissal of state law claims without prejudice after it granted summary judgment on the federal claims).

## IV.  Plaintiffs' Claims for Punitive Damages and Attorney's Fees

### A. Punitive Damages

Plaintiffs cannot recover punitive damages. To begin, municipalities are immune from punitive damages in suits brought under § 1983. Gonzalez v. Lee Cnty. Hous. Auth., 161 F.3d 1290, 1299 n.30 (11th Cir. 1998) (citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981)). This, coupled with the fact that Defendant Glynn County committed no constitutional violation,

means that Plaintiffs cannot recover punitive damages for their federal claims against Glynn County.

As to Officers Allen and Hampel, Plaintiffs must establish that Defendants were "motivated by an evil motive or intent, or there must be reckless or callous indifference to federally protected rights" to receive punitive damages for their § 1983 claims. Anderson v. Atlanta, 778 F.2d 678, 688 (11th Cir. 1985) (citing Smith v. Wade, 461 U.S. 30 (1983)). As explained above, Plaintiffs have not established that Defendants Allen and Hampel committed any constitutional violation, and Plaintiffs have not established that any of the requirements for punitive damages exist here. Plaintiffs, therefore, are not entitled to punitive damages for their § 1983 claims against Officers Allen and Hampel. Thus, Defendants' motions for summary judgment as to Plaintiffs' federal claim for punitive damages is **GRANTED**.[14]

**B. Attorney's Fees**

Plaintiffs' claims for attorney's fees also fail. Plaintiffs cannot recover attorney's fees for § 1983 claims when their substantive claims fail. See 42 U.S.C. § 1988(b) ("[T]he court, in its discretion, may allow the *prevailing* party, other than the United States, a reasonable attorney's fee." (emphasis added)). Because all of Plaintiffs' federal substantive claims fail,

---

[14] As stated in Section III, Plaintiffs' state law claims, including his claim for punitive damages, are **DISMISSED without prejudice.**

Plaintiffs' claims for attorney's fees on the federal claims fail as well. Therefore, Defendants' motion for summary judgment as to Plaintiffs' federal claim for attorney's fees is **GRANTED**.[15]

## CONCLUSION

For these reasons, Defendants' motions for summary judgment, dkt. nos. 28, 32, are **GRANTED** as to:

- Plaintiffs' § 1983 excessive force claim against Defendants Allen and Hampel (Count I);

- Plaintiffs' § 1983 failure to intervene claim against Defendant Hampel (Count I);

- Plaintiffs' § 1983 municipal liability claim against Defendant Glynn County (Count III);

- Plaintiffs' Americans with Disabilities Act and Rehabilitation Act claims against Defendant Glynn County (Counts IV, V, VI)

- Plaintiffs' federal claim for punitive damages; and

- Plaintiffs' federal claim for attorney's fees.

These claims are therefore **DISMISSED with prejudice.** Further, the Court declines to exercise supplemental jurisdiction as to Plaintiffs' state law claims, that is:

- Plaintiffs' claim for assault and battery against all

---

[15] As stated in Section III, Plaintiffs' state law claims, including their claim for attorney's fees, are **DISMISSED without prejudice.**

Defendants (Count II);

- Plaintiffs' claim for punitive damages; and

- Plaintiffs' claim for attorney's fees.

Plaintiffs' state law claims are therefore **DISMISSED without prejudice**. There being no claims remaining in this federal action, the Clerk is **DIRECTED** to enter judgment in favor of Defendants and close this case.

**SO ORDERED** this 4th day of February, 2025.

_____

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA